## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF MAINE

| | |
|---|---|
| TARA J. ROY,<br><br>    Plaintiff,<br><br>       v.<br><br>CORRECT CARE SOLUTIONS, LLC, et al.,<br><br>    Defendants. | Civil No.: 1:16-cv-00383-JDL |

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendants State of Maine, Department of Corrections ("DOC"), Rodney Bouffard, and Troy Ross (collectively, the "State Defendants") hereby submit this Motion for Summary Judgment, with incorporated memorandum of law, and respectfully request that summary judgment be entered in their favor on all of the claims brought against them by the Plaintiff, Tara Roy.  Count III of the Complaint alleges claims against DOC under the Maine Human Rights Act ("MHRA") and the Whistleblowers' Protection Act ("WPA").  Counts IV and V of the Complaint allege claims under 42 U.S.C. § 1983 against the individual defendants, Bouffard and Ross, for alleged violations of Roy's Equal Protection and First Amendment rights under the United States Constitution.  This motion seeks entry of judgment in DOC's favor on Count III, and in Bouffard and Ross's favor on Counts IV and V.  Counts I and II are brought only against Defendant Correct Care Solutions ("CCS") (which is separately represented) and are not addressed by this motion.

### *Facts*

DOC operates the Maine State Prison ("MSP").  State Defendants' Statement of Material Facts ("SDSMF") ¶ 2.  Bouffard was the Warden of the MSP at all times relevant to this motion. SDSMF ¶ 3.  Ross has been the Deputy Warden from October 2013 to the present.  SDSMF ¶ 4. In June 2012, DOC and CCS entered into a contract (the "Contract") under which CCS provides health care services to inmates in DOC's correctional facilities statewide, including the MSP. SDSMF ¶ 6.  CCS provides clinical staff and administrators to work in the MSP, all of whom are CCS employees and are not employed by DOC.  SDSMF ¶¶ 7-9.  CCS employees must comply with all DOC and facility security policies and procedures.  SDSMF ¶ 11.  The Contract provides that if a CCS employee violates security policies and procedures, DOC may deny the employee access to the facility.  SDSMF ¶ 11.

The Plaintiff, Tara Roy, was employed by CCS from August 2012 to October 2014 as a nurse.  SDSMF ¶¶ 12-13.  She reported to two CCS employees: the Director of Nursing, Robin Cross-Snell, and the Health Services Administrator, Elisabeth Lamson.  SDSMF ¶ 14.  Roy's job responsibilities including maintaining her security clearance and providing her complete support in abiding by the MSP's policies.  SDSMF ¶¶ 15-16.  CCS considered it unacceptable behavior for its employees to falsify reports or communications, and to fail to cooperate with any investigation conducted by CCS or other authorized agencies.  SDSMF ¶ 17.

At all times relevant to this motion, Roy was assigned to work in the MSP's medical clinic, which is next to the infirmary.  SDSMF ¶¶ 60-61.  Two correctional officers (employed by DOC) were assigned to the area, one to the medical clinic and one to the infirmary.  SDSMF ¶ 61.  If one of the officers had to leave to respond to an incident call elsewhere in the prison, the other officer would secure the infirmary and go to the clinic, or another correctional officer

would step in.  SDSMF ¶ 62.  In addition to the corrections staff, Roy had access to a portable radio device and a "man down button" that she could push to alert corrections staff outside the clinic to the need for emergency assistance.  SDSMF ¶¶ 63-64.  There was also at least one security camera in the clinic, and Roy was always accompanied by other CCS staff in the clinic. SDSMF ¶¶ 65-66.

In February 2013, Roy complained that the corrections officer who was working in the medical clinic, Officer ███ made dumb blonde jokes, mocked Roy for being from Lewiston, talked about making exceptions for females, and squeezed Roy's hand once, causing her pain. SDSMF ¶¶ 18-19.  DOC investigated and could not substantiate Roy's allegations.  SDSMF ¶ 20.

Bouffard and Ross were aware that Roy made some complaints about one officer, ███ being absent from his post for brief periods of time, but they were not aware of all of the specific complaints she made about ███ to her CCS supervisors.  SDSMF ¶¶ 22-23.  Nothing that Bouffard and Ross heard was serious enough to trigger an investigation.  SDSMF ¶ 22.

On August 26, 2014, Roy reported to Cross-Snell that Officer ███ called her a bitch twice that month, but did not perceive it to be sexual harassment.  SDSMF ¶¶ 24-27.  Roy had a sexual relationship with ███ outside of work before she made this report.  SDSMF ¶ 30.  CCS Regional Vice President John Newby talked to Roy, and DOC received a report from ███ in which he denied calling Roy a bitch.  SDSMF ¶¶ 28-31.  Both Roy and ███ disclosed that they had a personal relationship outside of work.  SDSMF ¶¶ 31, 34.  Newby advised Roy not to have relationships with officers outside of work.  SDSMF ¶ 31.  Ross counselled ███ to conduct himself in a professional manner at all times.  SDSMF ¶¶ 34-35.

On September 12, 2014, Roy submitted a report stating that on August 26, 2014, while Officer ███████ and Roy were responding to an incident call, ██████ told Roy that Sergeant ██████ had said they needed to get Roy "off her ass and moving."  SDSMF ¶ 37.  Roy did not report this immediately because she confronted ██████ and was satisfied with ██████ denial, but ██████ was upset about the allegation.  SDSMF ¶ 38.  DOC assigned an investigator to interview Roy, the officers, and witnesses, and collect written statements.  SDSMF ¶¶ 39-40.  The investigator concluded that all of the witnesses did not report any inappropriate conversation between Roy and ██████ and did not substantiate Roy's allegation.  SDSMF ¶¶ 41-42.

On September 23, 2014, Roy presented her CCS supervisor with a social media exchange between herself and Officer ██████ outside of work.  SDSMF ¶ 43.  Roy said ██████ asked for her phone number, told her to smile and be nicer to him, and said another officer, ██████ tried to get her fired.  SDSMF ¶¶ 43-44.  The exchange included a statement by Roy that she was "picking on" ██████ with her numerous complaints about him.  SDSMF ¶ 45.  Bouffard and Ross reviewed the exchange.  SDSMF ¶¶ 44-55.  They knew that ██████ was on administrative leave, and they were not aware of any reports ██████ had made about Roy.  SDSMF ¶ 55.  They did not interpret the exchange between ██████ and Roy to consist of workplace sexual harassment.  SDSMF ¶¶ 57-59.  The believed that the exchange fell into the category of off-duty communications between staff outside of the workplace, and it was not DOC's responsibility to get involved.  SDSMF ¶¶ 58-59.

On September 26, 2014, Officer ██████ was covering the clinic and Officer ██████ was covering the infirmary.  SDSMF ¶ 67.  At approximately 10:00 a.m., ██████ left the clinic to respond to an incident call.  SDSMF ¶ 67.  Afterwards, Roy reported to her CCS supervisors, Lamson and Cross-Snell, that CCS staff were left unsupervised in the clinic during the incident

call, with inmates present in the clinic.  SDSMF ¶ 68.  Lamson called MSP Captain Melquist and told him what had been reported to her.  SDSMF ¶ 69.  Melquist went to the clinic and talked to ██████████ who said he secured the infirmary and went to the clinic.  SDSMF ¶ 70.  Roy told Melquist that she had been left unsupervised in the clinic with inmates present, creating a safety risk.  SDSMF ¶ 71.  Melquist stated in a written report that Roy and another nurse, ██████ ██████████ told him that after ██████ left the clinic, ██████████ did not come to the clinic for fifteen minutes, leaving prisoners unattended.  SDSMF ¶ 72.  Melquist asked Roy and ██████ ██████ for written reports, and reported that Roy told him that she was told by Ross not to write any more reports on staff.  SDSMF ¶ 73.  Melquist told Roy that he did not want to see medical staff and security staff fighting with each other and that they needed to work together. SDSMF ¶ 80.

██████████████ wrote a report stating, "ICS called Approx 1000…Clinic officer ██████ left ... Infirmary CO ████████ remained seated in infirmary. 3 inmates still present in clinic with NO Supervision By DOC. Nurse asked officer to come over. No Response. Another Nurse asked again and officer did eventually come to clinic @ 1015. Safety Risk."  SDSMF ¶¶ 77-79, 81. Melquist reviewed the MSP's surveillance video that showed the medical clinic for the period from 10:00 to 10:19 that morning.  SDSMF ¶¶ 74, 82-85.  Melquist wrote in his report that the video showed an officer present in the clinic "the entire time" and shows ████████ "coming to the clinic side in 5 min."  SDSMF ¶ 75.  The video shows another correctional officer, Officer ██████ in the clinic within approximately 30 seconds after ██████ left the clinic at 10:01, and shows that he stayed in the clinic until ██████ returned from the call.  SDSMF ¶¶ 82-83.  The video shows ████████ in the clinic by approximately 10:06 and shows that he remained in the clinic with ██████ until ██████ returned shortly before 10:15.  SDSMF ¶ 84.

After Melquist reviewed the video, a meeting took place with Ross, Melquist, Lamson, Cross-Snell, and others. SDSMF ¶ 85. At this meeting, Melquist repeated that Roy said Ross had told her she could no longer write reports about DOC staff. SDSMF ¶ 89. Ross never told Roy she could not write reports. SDSMF ¶ 93. Based on the facts reported to him, Ross believed Roy made two false statements to Melquist: that clinic staff were left unsupervised by security with inmates in the clinic for fifteen minutes, and that Ross had told her she could not write incident reports. SDSMF ¶¶ 86-88. CCS suspended Roy after this meeting. SDSMF ¶ 91.

Bouffard was confident, based on all of the information he received, that Roy had made false statements and refused to follow Melquist's directive to write an incident report. SDSMF ¶¶ 95-96. Bouffard decided to revoke Roy's security clearance based on the information he received from Ross and Melquist. SDSMF ¶ 97. Bouffard decided to revoke Roy's security clearance because she made a false allegation about being left unsupervised by security in the clinic and because after being directed to make a written report about the incident, she refused to write the report. SDSMF ¶ 98. Bouffard did not revoke ███████████ security clearance because he believed she was a new CCS employee and took direction from Roy, who had been there for over two years. SDSMF ¶ 99.

On October 2, 2014, Bouffard sent an email to Newby, stating, "Effective immediately as a result of misconduct nurse Tara Roy will no longer be allowed entrance to the facility. Specifically, she misrepresented the truth and subsequently failed to follow a directive." SDSMF ¶ 100. Neither Bouffard nor Ross knew that the decision to revoke Roy's security clearance at MSP would necessitate the termination of her employment by CCS. SDSMF ¶ 102.

On May 28, 2015, Roy submitted a charge to the Maine Human Rights Commission in which she checked off only "Retaliation" and "Whistleblowers' Retaliation," and wrote, "I

believe that I have been discriminated against in employment because I engaged in protected

activity under the Whistleblowers' Protection Act, the Maine Human Rights Act, and Title

VII…."  SDSMF ¶ 103.

### *Argument*

## I.    Standard of Review on Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  For summary

judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of

the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the

potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc. v. Certain*

*Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

The court must view the evidence in the light most favorable to the non-moving party,

but, "as to any essential factual element of its claim on which the nonmovant would bear the

burden of proof at trial, its failure to come forward with sufficient evidence to generate a

trialworthy issue warrants summary judgment to the moving party."  *In re Spigel,* 260 F.3d 27,

31 (1st Cir. 2001).  The Court is not "required to 'accept as true or to deem as a disputed material

fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a

party."  *Bonefont–Igaravidez v. International Shipping Corp.,* 659 F.3d 120, 123 (1st Cir. 2011)

(quoting *Torrech–Hernández v. Gen. Elec. Co.,* 519 F.3d 41, 47 (1st Cir. 2008)).  "'Even in

employment discrimination cases where elusive concepts such as motive or intent are at issue,'

summary judgment is appropriate if the non-moving party rests 'merely upon conclusory

allegations, improbable inferences, and unsupported speculation.'"  *Benoit v. Technical Mfg.*

*Corp.,* 331 F.3d 166, 173 (1st Cir. 2003) (quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000)).

**II.    DOC Is Entitled to Summary Judgment on All Claims Against It because under the Law Court's decision in *Fuhrmann*, Non-employers like DOC Cannot Be Held Liable under the MHRA and the WPA for Employment Discrimination.**

Count III of the Complaint alleges claims against DOC under the MHRA and the WPA. The MHRA provides that employment discrimination is committed by an "employer." 5 M.R.S. § 4572(1)(A). The WPA prohibits discrimination by an "employer." 26 M.R.S. § 833(1). The MHRA makes a violation of the WPA a form of unlawful employment discrimination that, again, may only be committed by an "employer." 5 M.R.S. § 4572(1)(A). Roy does not dispute that CCS was her employer and DOC was not. Roy does not allege that DOC gains employer status through a joint employer theory or an integrated enterprise theory, for example. Instead, Roy alleges that DOC committed unlawful discrimination under the MHRA pursuant to sections 4553(10)(D), 4633(1) and (2) of the MHRA.[1] Because these provisions do not allow non-employers to be held liable for employment discrimination, judgment should be entered in DOC's favor on Count III.

Specifically, Count III alleges the following claims, listed in the order in which they appear at ¶ 86 of the Complaint:

1) "The DOC incited, compelled, or coerced CCS to terminate Plaintiff's employment because she engaged in activity protected under the WPA and the MHRA…." This claim quotes § 4553(10)(D), which defines "unlawful discrimination," in part, as "[a]iding, abetting, inciting, compelling or coercing another" to commit unlawful discrimination.

---

[1] To the extent that Roy tries to characterize her count against DOC as stating a claim for anything other than retaliation in her employment, she is foreclosed by her Maine Human Rights Commission charge, in which she checked off only "Retaliation" and "Whistleblowers' Retaliation," and wrote, "I believe that I have been discriminated against in employment because I engaged in protected activity under the Whistleblowers' Protection Act, the Maine Human Rights Act, and Title VII…." SMF. She has failed to exhaust administrative remedies with respect to any other type of claim under the MHRA against DOC.

2)   "[The DOC] intimated, threatened, and interfered with Plaintiff in the exercise or enjoyment of the rights granted or protected by the MHRA…."  This claim quotes § 4633(2), the interference provision of the MHRA.

3)   "[The DOC] obstructed or prevented CCS from complying with the MHRA…."  This claim quotes § 4553(10)(D), which defines "unlawful discrimination," in part, as "obstructing or preventing any person from complying with" the MHRA.

4)   "[The DOC] discriminated against Plaintiff because [a] she opposed acts or practices that are unlawful under the MHRA or because [b] she made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the MHRA…."  This claim quotes § 4633(1), the retaliation provision of the MHRA.

None of these claims can be maintained by an employee against non-employers, according to opinions from this District and from the Maine Superior Court, all of which flow from the Maine Supreme Judicial Court's landmark holding in *Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, 58 A.3d 1083.

In *Fuhrmann*, the Law Court directly answered the question of whether individual supervisors may be held liable for employment discrimination under the MHRA and the WPA. Because "the relevant portion of the employment discrimination section of the MHRA applies only to 'employer[s],' 5 M.R.S. § 4572(1)(A)," as does the WPA, the Law Court focused on whether the two statutes should be interpreted to include an individual supervisor in their definitions of "employer."  *Fuhrmann*, 2012 ME 135, ¶ 24 & n.7.  The Law Court first analyzed the plain language of the two statutes and found that they were reasonably susceptible to two opposing interpretations:  one, that agents of an employer were a distinct category of individuals subject to liability; or, that the statutes simply incorporated respondeat superior liability in order to ensure that employers could be held liable for actions taken by their agents. *Id.* ¶¶ 24-26. Finding the plain language of the MHRA and the WPA ambiguous, the Law Court turned to analogous federal law for guidance but found it unhelpful.  *Id.* ¶ 27.  Also finding the relevant legislative history to be unenlightening, the Law Court moved on to consider whether the Maine

Human Rights Commission's ("MHRC") position, which interpreted both the MHRA and the WPA to provide for individual supervisor liability, deserved deference. *Id.* ¶¶ 28-31. The Law Court decided it did not, finding that the MHRC's interpretation exceeded, and was contrary to, the Legislature's intent. *Id.* ¶ 31.

The Law Court concluded that the definitions of "employer" under both the MHRA and the WPA, when read in light of their underlying purposes and in context of the statutory scheme as a whole, "are meant to hold the principal/employer liable for acts of its agents/employees," *id.* ¶ 32, and adopted the interpretation that the statutes simply incorporated the doctrine of respondeat superior liability and did not create individual liability for employees or agents. The Law Court's opinion stated that for the Court to reach a different conclusion, the Legislature would have needed to state an intent to create individual supervisor liability under the MHRA and the WPA, "explicitly in much clearer terms," and that, "[i]n the absence of any clear indication to that effect, we will not undermine the purpose of these statutes by reading them to provide for individual supervisor liability." *Id.* ¶ 34.

Since *Fuhrmann*, some plaintiffs have tried to circumvent its holding by evoking the same provisions in the MHRA that Roy tries to rely on, without success. For example, in *Enos v. Orthopedic & Spine Physical Therapy of L/A, Inc.*, 2014 Me. Super. LEXIS 225 (Me. Super Nov. 18, 2014), the plaintiff argued that the individual defendant should be liable for whistleblower retaliation under either the aiding and abetting provision of the MHRA, found in the definition of unlawful discrimination at § 4553(10)(D) , or the interference provision, found at § 4633(2). The Superior Court (Kennedy, J.) rejected the plaintiff's argument with respect to both provisions, noting:

> It is unclear to this court…why Maine would allow individual supervisor liability for
> aiding and abetting discrimination or interference, when there is no individual supervisor

> liability for employment discrimination.  This court bears in mind that after interpreting the statute, the Law Court came to the conclusion in *Fuhrmann* that "we will not undermine the purpose of these statutes by reading them to provide for individual supervisor liability."

*Enos*, 2014 Me. Super. LEXIS 225 at *9-10 (quoting *Fuhrmann*, 2012 ME 135, ¶ 34.)

Recognizing that the plaintiff's claims were "essentially unlawful employment discrimination claims…framed differently," the court dismissed the claims against the individual defendant, concluding that "allowing these two claims [aiding and abetting, and interference] to go forward against [the individual defendant] would be contrary to the Law Court's intent in *Fuhrmann*." *Id.* at *13-14.

In a recent case in the United States District Court in Maine, the court applied similar reasoning to a plaintiff's attempt to apply the aiding and abetting and interference provisions of the MHRA, not to an individual defendant, but to a non-employer entity. [2] *See United States ex rel. Worthy v. E. Me. Healthcare Sys.*, 2017 WL 211609 (D. Me. Jan. 18, 2017) (Woodcock, J.). In rejecting the plaintiff's attempt to bring her whistleblower claim against a non-employer by using the MHRA's interference provision, § 4633(2), the *Worthy* court relied on the Law Court's statement in *Fuhrmann* that "the rights protected by the relevant employment discrimination provision of the MHRA and retaliation provisions of the MWPA are limited in their application to employers only." *Id.* at *32 (citing *Fuhrmann*, 2012 ME 135, ¶ 24 n.7, and 26 M.R.S. § 833(1)(A)).  The *Worthy* court found that *Fuhrmann* left no doubt as to the applicability of its holding to a claim under § 4633(2) against a non-employer:

> [T]he Maine Law Court concluded that only an employer can be liable for employment discrimination under the MHRA.  Although the *Fuhrmann* case dealt with individual supervisor liability, the basic premise applies with equal force to this case.  Only an

---

[2] The plaintiff in *Worthy* alleged that the defendant in question, CHMB, was a joint employer, and she argued in the alternative that CHMB could be liable even if it were not her employer.  *Worthy*, 2017 WL 211609, at *32.  In this case, Roy does not allege that DOC was a joint employer and relies exclusively on the theory that DOC can be held liable for employment discrimination as a non-employer.

> employer can be liable under the MHRA for retaliation for whistle-blowing activity. To hold otherwise would mean that even though an individual supervisor cannot be held liable, a non-employer third party could be.

*Id.* (internal quotation and citation omitted).

The plaintiff in *Worthy* met the same fate when she argued that the non-employer defendant could be held liable for aiding and abetting the other defendants' unlawful employment discrimination, relying on the aiding and abetting language in § 4553(10)(D). *Id.* at *33. The *Worthy* Court rejected this application of § 4553(10)(D), stating that to its knowledge, there is "no decision by any court in the state of Maine that has held or even addressed whether a non-employer can be liable for aiding and abetting in the context of a MWPA retaliation claim." *Id.* The Court expressed skepticism that if given the chance, the Law Court would adopt what would amount to an exception to its holding in *Fuhrmann*, observing:

> [T]he exception to the Maine Supreme Judicial Court's holding in *Fuhrmann* would become the rule since an aiding and abetting allegation would necessarily survive a motion to dismiss and might even survive a motion for summary judgment, causing non-employers to fall within the MWPA in a manner contrary to *Furhmann*. The Court declines to create an exception to the *Fuhrmann* rule based on the aiding and abetting provision of the MWPA.

*Id.*

Even more recently, a second judge in this District has followed suit, this time addressing a plaintiff's attempt to use sections 4633(1) and 4633(2) of the MHRA. *See Charette v. St. John Valley Soil & Water Cons. Dist.*, 2017 WL 2683951 (D. Me. June 20, 2017) (Singal, J.). In *Charette*, the plaintiff argued that *Fuhrmann* did not address either § 4633(1), the retaliation provision, or § 4633(2), the interference provision, and that these provisions prohibit a "person," not just an employer, from discriminating, retaliating, or interfering with an individual's exercise of rights under the MHRA. *Id.* at *12. The plaintiff also argued that the MHRC has taken the position that these two sections permit individual liability. *Id.* The *Charette* court, however,

concluded that both of these arguments were addressed and rejected by the Law Court in

*Fuhrmann*:

> Although it is strictly the case that *Fuhrmann* did not address these provisions, the Court reads *Fuhrmann* as foreclosing any recourse to individual liability in the employment context under the [MHRA].  In particular, the *Fuhrmann* court broadly stated that "the statutory scheme as a whole and its underlying policy" compelled the conclusion that "there is no individual supervisor liability for employment discrimination" pursuant to the MHRA.  Indeed, the partially dissenting justices in *Fuhrmann* likely understood the implicit breadth of the decision when they opined that it rendered a separate provision of the MHRA limiting punitive damages "against an employee" a nullity.

*Id.*  The court noted that it was joining the courts that had decided *Worthy* and *Enos* "in

determining that there is no individual liability for employment discrimination under Section

4633 of the MHRA."  *Id.*  Therefore, to be consistent with *Worthy*, there also can be no liability

for employment discrimination against a non-employer under either § 4633(1) or § 4633(2).

   In keeping with the decisions in *Enos, Worthy,* and *Charette*, Roy's second and fourth

claims in the list on pages 8-9 above should be barred against DOC because they rely on §

4633(2) and § 4633(1), respectively, in attempting to make a non-employer liable for

employment discrimination.  As for the first and third claims in the list, they are both based on

language contained in § 4553(10)(D).  While Roy omits the words "aiding" and "abetting,"

which are the first words in § 4553(10)(D), the words she does use – "inciting, compelling or

coercing," another to discriminate, and "obstructing or preventing any person from complying

with" the MHRA, are all taken from § 4553(10)(D).  The reasoning used by the *Worthy* court

with respect to "aiding and abetting" applies equally to the other actions listed in § 4553(10)(D).

DOC is not aware of any court in Maine that has addressed whether a non-employer can be liable

for inciting, compelling or coercing an employer to engage in unlawful employment

discrimination, or for obstructing or preventing an employer from complying with the MHRA.  If

the Court applied any part of § 4553(10)(D) to DOC as a non-employer, it would create the same

all-consuming exception to *Fuhrmann* that the *Worthy* court declined to create.  As concluded by the *Worthy* court, § 4553(10)(D) should not be used to avoid the holding in *Fuhrmann*.

In sum, this Court should follow the reasoning and the holdings of *Enos*, *Worthy*, and *Charette*, and enter judgment in DOC's favor on Count III of the Complaint because DOC was not Roy's employer and cannot be held liable for employment discrimination under the MHRA and the WPA.  Alternatively, if the Court concludes that DOC can be held liable under the MHRA and the WPA, it is still entitled to summary judgment because Roy cannot establish a *prima facie* case of discrimination or retaliation for the reasons argued by CCS in its memorandum in support of summary judgment, which DOC incorporates herein by reference.  Specifically, Roy's sexual harassment and sex discrimination claims are barred for failure to exhaust administrative remedies; she cannot establish the elements of a hostile work environment based on sexual harassment; she did not engage in protected activity under the MHRA or the WPA; DOC had legitimate, non-retaliatory reasons to revoke her security clearance; Roy cannot show DOC's reasons were pretextual; and, there is no causal connection between any protected activity and DOC's decision to revoke Roy's security clearance, where Roy's false report about being left without security and her refusal to write a report cannot constitute protected activity.

## III.    **Bouffard and Ross Are Entitled to Summary Judgment on All Claims Against Them.**

### A.    Roy cannot establish a *prima facie* case against the individual defendants for violating her right to equal protection.

Roy's Equal Protection claims against Bouffard and Ross allege that they failed to stop MSP staff from sexually harassing her and retaliating against her for complaining about sexual harassment, and that they themselves retaliated against her for complaining about sexual harassment.  Compl. ¶ 88.  These claims are brought under 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution.  Compl. ¶ 1.  "To prove a violation of the

equal protection clause, a plaintiff must show that the defendant acted with discriminatory intent." *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 239-42 (1976)).  "When a plaintiff attempts to use § 1983 as a parallel remedy to a Title VII claim, the *prima facie* elements to establish liability are the same under both statutes." *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003) (footnote omitted).  However, "the First Circuit has made clear that an Equal Protection claim involves an additional element not present in garden-variety employment discrimination claims— '[s]ome evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim.'" *Charette*, 2017 WL 2683951, at *14 (quoting *Ayala-Sepúlveda v. Municipality of San Germán*, 671 F.3d 24, 32 (1st Cir. 2012)).

1.   Failure to stop sexual harassment.

The claim that Ross and Bouffard failed to stop MSP staff from sexually harassing Roy is a claim for supervisory liability under § 1983, as they are not alleged to have engaged in harassment themselves.  It is well established that supervisory liability "may not be predicated upon a theory of *respondeat superior.*"  *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989).  Instead, "the supervisor's liability must be premised on his own acts or omissions."  *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016).  The First Circuit has held that a "substantial campaign of harassment, instigated or knowingly tolerated by superiors," can form the basis for a § 1983 retaliation claim based upon the First Amendment. *Rosario-Urdaz v. Velazco,* 433 F.3d 174, 179 (1st Cir. 2006); *see also Manzer v. Town of Anson,* 771 F. Supp. 2d 121, 131 (D. Me. 2011).  However, a supervisor can only be held liable for the actions of subordinates where there is an affirmative link between the supervisor and the subordinate's behavior that could be characterized as "supervisory encouragement, condonation or acquiescence" or "gross negligence amounting to deliberate indifference."  *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002); *see also Lipsett v. Univ. of P.R.*, 864 F.2d 881, 902 (1st

Cir. 1988).  "The 'affirmative link' requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  *Hegarty v. Somerset County*, 53 F.3d 1367, 1379-80 (1st Cir. 1995).  No such affirmative link can be shown here.

Roy cannot establish that either Ross or Bouffard knowingly tolerated any subordinate's behavior that resulted in a constitutional violation because she cannot establish the *prima facie* elements of a claim for sexual harassment under Title VII.  "To establish a hostile work environment, a plaintiff must show that her workplace was permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment."  *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 43 (1st Cir. 2011) (quotations omitted); *see also Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 217 (1st Cir. 2016) ("In assessing whether conduct is severe or pervasive and both objectively and subjectively offensive, we evaluate 'the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance.'")  "[S]ummary judgment is an appropriate vehicle for 'polic[ing] the baseline for hostile environment claims.'"  *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006) (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).

Taken in the light most favorable to Roy, the evidence shows that Officer ███ called Roy a bitch twice; Officer ███ asked her for her phone number and told her she should smile and be nicer; and Officer ███ told her that Sergeant ███ said she should "get off her ass and moving."  These incidents come nowhere close to stating a claim for a hostile work environment based on sex because the alleged conduct is neither severe nor pervasive, nor is it

objectively offensive.[3]  *See, e.g., Santiago v. Lloyd,* 66 F. Supp. 2d 282, 287 (D.P.R. 1999) (male

employee calling female employee "bitch," and claiming she was in sexual relationship with

coworker not severe or pervasive enough to constitute reasonable belief of sexual harassment).

Roy also cannot establish that the harassment by subordinates that she describes was

based on sex.  Even Roy conceded that being called a "bitch" was not sexual harassment.  *Cf.*

*Forrest v. Brinker Int'l Payroll Co.,* 511 F.3d 225, 229 (1st Cir. 2007) (barrage of degrading

epithets, only one of which was "bitch," was harassment based on sex).  To the extent that she

was harassed because she had sexual relationships with coworkers, courts have held that this

motivation does not necessarily mean the harassment was based on sex; the issue is whether

"improper gender bias can be inferred from conduct."  *Forrest,* 511 F.3d at 229; *see Morales-*

*Cruz v. Univ. of P.R.*, 676 F.3d 220, 225-26 (1st Cir. 2012) (adverse action based on plaintiff's

poor judgment regarding sexual relationship not based on sex); *Tenge v. Phillips Modern AG*

*Co.*, 446 F.3d 903, 909-10 (8th Cir. 2006) (termination of employee based on employee's

admitted consensual sexual conduct with supervisor not discrimination on basis of sex under

Title VII); *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 306-08 (2d Cir. 1986) ("The

---

[3] Roy also reported in February 2013 that an officer had made dumb blonde jokes and squeezed her hand.
These incidents were not mentioned in the MHRC charge, are time-barred because they occurred more
than 300 days before Roy filed the charge, and cannot be relied upon to support her claim alleging
supervisory liability for failure to stop sexual harassment.  *See Tomasello v. Fairfax Cty.*, 2016 WL
165708, at *6 (E.D. Va. Jan. 13, 2016) (rejecting untimely allegations about different actor in different
time frame than what was alleged in EEOC charge).  Even if these allegations could be included in the
analysis, the incidents as described by Roy would not tip the scale far enough to establish a *prima facie*
case of severe or pervasive sexual harassment.

Roy's reliance on off-duty communications to support her hostile work environment claim should
similarly be rejected.  Employers are not generally responsible under Title VII for hostile sexual acts
resulting from non-work-related, off-duty interactions between co-employees. *Holmes v. Utah, Dep't of*
*Workforce Servs.,* 483 F.3d 1057, 1068 (10th Cir. 2007) (employer not liable under Title VII for off work
premises torts by nonemployees even if found severe in sexual overtones); *Geggatt v. Deese,* 2009 WL
2913533, *5 (M.D. Fla. Sep. 10, 2009); *Meece v. Atl. Se. Airlines, Inc.,* 2006 WL 2228937, *2 (N.D. Ga.
Aug. 2, 2006); *P.F. v. Delta Air Lines, Inc.,* 102 F. Supp. 2d 132, 138 (E.D.N.Y. 2000), *vacated on other*
*grounds by Ferris v. Delta Air Lines, Inc.,* 277 F. 3d 128 (2d Cir. 2001).

proscribed differentiation under Title VII…must be a distinction based on a person's sex, not on his or her sexual affiliations….[W]e hold that voluntary, romantic relationships cannot form the basis of a sex discrimination suit under…Title VII….."); *Huebschen v. Dep't of Health & Social Servs.,* 716 F.2d 1167, 1171-72 (7th Cir. 1983), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)) (rejecting equal protection claim based on allegations of retribution by plaintiff's supervisor after consensual relationship ended).

Even if she could make a *prima facie* case for sexual harassment by non-supervisory MSP staff, Roy cannot establish the additional required element of a § 1983 claim of producing "some evidence of actual disparate treatment," because the record does not indicate that either Bouffard or Ross treated Roy differently from others similarly situated. *Charette*, 2017 WL 2683951, at *14.

Finally, there is no evidence that any action or inaction by Bouffard or Ross "could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." *Lipsett*, 864 F.2d at 902 (internal quotations and citations omitted). Deliberate indifference requires the defendants to have been able to infer that a "substantial risk of serious harm" existed, which cannot be inferred based on the facts in this case. *Guadalupe-Baez*, 819 F.3d at 515. In addition, supervisory liability requires "…proof that the supervisor's conduct led inexorably to the constitutional violation." *Id.* (quoting *Hegarty,* 53 F.3d at 1380). "That is a difficult standard to meet but far from an impossible one: a plaintiff may, for example, prove causation by showing inaction in the face of a known history of widespread abuse sufficient to alert a supervisor to ongoing violations….[but] isolated instances of unconstitutional activity will not suffice." *Id.* (internal quotations omitted). Roy's reports of

one officer she had dated calling her a bitch, a second officer saying she should get off her ass, and a third officer asking for her phone number do not suffice.

### 2.  Failure to stop retaliation / Direct retaliation.

Regarding the part of Roy's equal protection claim that rests on claims of retaliation, either direct retaliation by Bouffard and Ross or their failure to stop retaliation committed by their subordinates, "[t]he right to be free from retaliation is clearly established as a *first amendment* right and as a statutory right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation."  *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1237 (8th Cir. 2013) (emphasis in original) (quoting *Ratliff v. DeKalb County*, 62 F.3d 338, 341 (11th Cir. 1995)); *see also Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) (refusing to recognize retaliation claim under equal protection clause); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 447 (4th Cir. 2004) (same); *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (same); *Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997) (same).  This is true even where the alleged retaliation is for complaining about employment discrimination.  *See Burton*, 737 F.3d at 1237; *Watkins*, 105 F.3d at 1354 (plaintiff could not bring claim she was fired in retaliation for complaints regarding sexual and racial harassment under equal protection clause); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."); *but see Vega v. Hempstead Union Free School Dist.,* 801 F.3d 72, 82 (2d Cir. 2015) (holding state employee may bring retaliation claim against individual supervisor under § 1983 and equal protection clause).  Although the First Circuit does not appear to have addressed this question, at least one court in the Circuit has noted the holdings in other circuits.  *See Rodriguez-Melendez v. Rivera*, 1998 WL 151870, at *3 (D.P.R. Mar. 23, 1998).

This Court should follow all of the circuits that have considered this question, save one, and hold that Roy's claims that Bouffard and Ross retaliated against her for opposing sexual harassment, and failed to stop retaliation by staff for reporting sexual harassment, cannot be brought under the equal protection clause.

B. Bouffard and Ross are entitled to qualified immunity from Roy's claims for violation of her right to equal protection.

Public officials sued for money damages in their individual capacities under § 1983 are entitled to qualified immunity unless (1) the facts alleged demonstrate that the individual defendant's conduct violated a statutory or constitutional right, and (2) the contours of that right were "clearly established" under then-existing law so that a reasonable official would have known that his or her conduct was unlawful.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011); *Eves v. LePage*, 842 F.3d 133, 140 (1st Cir. 2016); *Morales v. Chadbourne*, 793 F.3d 208, 214 (1st Cir. 2015).  "Courts may conduct this inquiry sequentially, or resolve a particular case on the second prong alone."  *Barton v. Clancy*, 632 F.3d 9, 22 (2011).  "The second prong, in turn, contains two subparts: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right."  *Eves*, 842 F.3d at 140 (internal quotation omitted).  "Qualified immunity ultimately shields 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* at 140-41 (citation omitted).  Therefore, an individual defendant is entitled to qualified immunity as long as a reasonable official in his position "objectively could have been uncertain about either the contours of the legal landscape or the constitutionality of this particular series of actions."  *Id.* at 141; *see also Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008).

With respect to Roy's claims based on retaliation, Bouffard and Ross are entitled to qualified immunity because "no clearly established right exists under the *equal protection* clause to be free from retaliation." *Burton*, 737 F.3d at 1237 (emphasis in original) (reversing denial of qualified immunity). It appears that only the Second Circuit has held that such a right exists. *See Vega,* 801 F.3d at 82; *see also Cannell v. Corizon, LLC,* 2015 WL 8664209, at *9 (D. Me. Dec. 11, 2015) (noting "disagreement" between Second Circuit and others). *Vega* was decided in 2015, after the conduct that is at issue in this case occurred. Prior to the decision in *Vega,* the right was not established even in the Second Circuit. *See Warburton v. John Jay Coll. of Criminal Justice of the City Univ. of New York*, 2016 WL 3748485, at *2-3 (S.D.N.Y. July 7, 2016), *aff'd sub nom. Warburton v. Hoffman*, 677 F. App'x 9 (2d Cir. 2017) (granting qualified immunity from retaliation claims brought under equal protection clause where conduct predated *Vega*); *see also Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011) ("Unlawfulness must be apparent at the time of the alleged violation 'in the light of pre-existing law.'") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In the absence of a clearly established right under the Equal Protection Clause to freedom from retaliation for complaining about employment discrimination, at least as of the time the acts alleged in this case occurred, it cannot be said that there was "existing precedent…that placed the statutory or constitutional question beyond debate." *Eves*, 842 F.3d at 142.

To the extent that Roy tries to predicate her equal protection count on a claim that Bouffard and Ross failed to stop sexual harassment of Roy by MSP staff, for the reasons stated above, she cannot establish that either Bouffard or Ross committed a constitutional violation. Furthermore, there is no precedent that would allow an officer in Bouffard or Ross's position to know "beyond debate" that the manner in which they addressed Roy's allegations was

unconstitutional where one officer was counseled for unprofessional behavior, a second

allegation was investigated and could not be substantiated, and the third allegation involved

communications outside of the workplace that did not constitute workplace harassment.

>    C. Roy cannot establish a *prima facie* case of First Amendment retaliation against the
>    individual defendants.

The First Circuit has set out a three-part test for determining whether an adverse

employment action violated a public employee's First Amendment right to freedom of speech.[4]

*See McGunigle v. City of Quincy*, 835 F.3d 192, 202 (1st Cir. 2016) (citing *Decotiis v.*

*Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)).  First, a plaintiff must establish that she spoke as a

private citizen on a matter of public concern.  *See id*.  Second, the plaintiff's interests in speaking

must outweigh the employer's interest in functioning efficiently.  *See id*.  Third, the plaintiff

must show that her protected speech was a substantial or motivating factor in the adverse

employment action.  *See id*.  Even if the plaintiff can establish all three parts of the test, the

employer may not be held liable if it can show that it would have reached the same decision even

absent the protected speech.  *See id*.  The test should be applied only to that speech that was the

reason for Bouffard's decision to revoke Roy's security clearance, not to other speech that Roy

may have made.  *See Waters v. Churchill*, 511 U.S. 661, 681 (1994).  However, the State

Defendants contend that none of Roy's speech was made as a private citizen on a matter of

public concern, thereby foreclosing any claim under the First Amendment.

>    1. Roy did not speak as a private citizen.

"[P]ublic employees do not speak as citizens when they 'make statements pursuant to

---

[4] "The Supreme Court has held that there is not a 'difference of constitutional magnitude between independent [government] contractors and [public] employees' in the context of First Amendment retaliation analysis."  *Vollette v. Watson*, 937 F. Supp. 2d 706, 721 n.16 (E.D. Va. 2013) (quoting *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 684 (1996)).  Although it is undisputed that Roy was employed by CCS, not DOC, for ease of reference, DOC will refer to the law as it pertains to public employees.  *See Decotiis*, 635 F.3d at 26 n.1.

their official duties.'" *Decotiis*, 635 F.3d at 30 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  Courts must first identify the employee's official responsibilities and then determine whether the speech in question was made pursuant to those responsibilities. *See id.* at 31.  In determining an employee's official responsibilities, "the proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description." *Id.* (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)).

These duties do not have to relate to the specific tasks a plaintiff performs, but may relate to general expectations of employees.  For example, "an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior to a supervisor." *Kubiak v. City of Chicago*, 810 F.3d 476, 479, 481-82 (7th Cir. 2016) (holding police officer did not speak as private citizen when she reported another officer's enraged verbal assault and her fear that he would physically assault her).  Such a report is not about a matter of public concern because it reflects "an employee's attempt to improve her work environment so that she would not be harassed again," and is "intimately connected with [the employee's] professional duties." *Id.* at 482.  Employees' responsibilities should not be limited to the core functions of their job, and a correctional officer who may be assigned specific duties also has "a more general responsibility to keep the facility secure and report any suspicious behavior by prison inmates, staff, or visitors to her superiors." *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (vacating jury verdict after *Garcetti* decision changed outcome of private citizen analysis).  It stands to reason that an employee of a contractor who works in a correctional facility also has a general responsibility to report behavior by the contractor's staff, DOC staff, or inmates that she believes presents a safety or security risk, regardless of what her specific duties are.  Moreover, as a CCS employee, Roy

was required to abide by all MSP policies relating to security and safety, which would include the general responsibility to report observed safety or security risks.

In determining whether the plaintiff made the speech pursuant to her responsibilities, the Court may consider factors that relate to the context of the speech. *See Decotiis*, 635 F.3d at 32. The fact that Roy made internal reports at work, within her chain of command, "to an audience to which [she] only [had] access through her job," supports the view that she was speaking as a public employee. *Id.* Her knowledge was derived from her position and concerned the subject matter of her employment. *See id.* at 34. Finally, there is no "citizen analogue" to her speech, because no citizens in the community would be discussing Roy's disputes with people she worked for or had personal relationships with, nor would citizens be in a position to comment on a particular correctional officer being at his post. *See id.* at 34. For all of these reasons, Roy was speaking as an employee of a private contractor doing business with State government, akin to a public employee, and not as a private citizen.

### 2.   Roy did not speak on a matter of public concern.

In determining whether speech addresses a matter of public concern, the courts look to the content, form and context of the speech. *Connick v. Myers,* 461 U.S. 138, 147-148 (1983). If her speech involved matters of personal interest instead of matters of public concern, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. The First Amendment does not empower plaintiffs to "constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154).

Roy's complaints did not implicate a matter of public concern because their content did not involve "official malfeasance, abuse of office, and neglect of duties," or any other matter that

would implicate the ability of DOC personnel to "carry out their responsibility to the public." *Rosado-Quinones v. Toledo*, 528 F.3d 1, 5 (1st Cir. 2008) (agreeing with lower court that plaintiff's "labor harassment" complaint was "a classic example of speech concerning internal working conditions affecting only the speaker and co-workers"); *see also LaSalle v. Puerto Rico Elec. Power Auth.*, 144 F. Supp. 3d 274, 279 (D.P.R. 2015) ("Public concern is not usually involved when speech rights are invoked in connection with individual workplace disputes and grievances.").

Regarding Roy's complaints of alleged sexual harassment, one described an officer, with whom she had broken off a consensual sexual relationship, allegedly getting angry with her and calling her a bitch at work; a second complaint, that could not be substantiated, said that an officer said she needed to get off her ass; and a third officer asked for her phone number outside of work.  Roy's complaints about these personal incidents do not touch on a matter of public concern because they do not describe a systemic problem of sexual harassment.  "Complaints of gender-based employment discrimination generally fail to qualify as protected speech because such complaints are typically personal in nature and relate solely to the employee's unique employment situation as opposed to systemic discrimination."  *Atkinson v. New York State Olympic Reg'l Dev. Auth.*, 822 F. Supp. 2d 182, 193 (N.D.N.Y. 2011) (citing *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 143 (2d Cir.1993)); *see also Tang v. State of R.I. Dep't of Elderly Affairs*, 163 F.3d 7, 12 (1st Cir. 1998) (holding six alleged acts of "harassment and retaliation" were, in fact, "individual personal complaints about working conditions" and thus not a matter of public concern).

The First Circuit has not squarely addressed under what circumstances, if any, a public employee's report to public supervisory officials that she was sexually harassed, or retaliated

against for complaining about that harassment, is protected speech. [5]  Given that there is neither

"controlling authority" nor "a robust 'consensus of cases of persuasive authority'" supporting

Roy's position, the individual defendants are entitled to qualified immunity.  *Ashcroft*, 563 U.S.

at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see, e.g., Vollette v. Watson,* 937 F.

Supp. 2d 706, 724 (E.D. Va. 2013) (granting qualified immunity to sheriff who revoked

contractors' security clearances where it was "close question" whether plaintiffs' speech

addressed matter of public concern).

Regarding Roy's alleged complaints about Officer ██████ being absent from his post for

short periods of time, and her complaint that clinic staff were left alone in the clinic without

security for fifteen minutes, the mere fact that these complaints could relate to the safety of Roy

and others in the MSP's clinic does not mean that their subject matter is of public concern.  "[I]f

either official misconduct or neglect of duties was asserted to be responsible for unsafe

conditions for the general public," then it could be a matter of public concern; however, if the

speech consisted of "performance critiques [that] concerned only matters of internal working

conditions, and the discussion of 'safety issues' … likewise reflected an employee workplace

concern rather than the public interest, plaintiffs' constitutional claim would falter at the

threshold inquiry."  *Jordan v. Carter*, 428 F.3d 67, 73 (1st Cir. 2005) (issues about safety at

public transit station not necessarily matter of public concern).  Roy's "performance critiques" of

██████ and ████████ reflected an "employee workplace concern," not a concern for the safety

---

[5] *See also Morris v. City of Colorado Springs*, 666 F.3d 654, 662 (10th Cir. 2012) (holding that individual complaint of hostile work environment is not matter of public concern); *Holbrook v. City of Alpharetta,* 112 F. 3d 1522, 1530 (11th Cir. 1997) (holding that allegation of disability discrimination did not raise matter of public concern); *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) (holding that "purely personal grievances" of sexual harassment not matters of public concern); *Saulpaugh,* 4 F.3d at 143 (harassment claim not of public concern where it was "personal in nature and generally related to her own situation.").  *But see Johnson v. Louisiana*, 369 F.3d 826, 833, n.6 (5th Cir. 2004) ("allegations of sexual harassment... are always matters of public concern").

of the general public, who do not have access to the MSP's health clinic.  *See, e.g., Supinger v. Virginia*, 167 F. Supp. 3d 795, 803-04, 812-13, 815 (W.D. Va. 2016) (where plaintiff complained that coworker posed danger due to serious mental health issues, court determined that was not matter of public concern because it related only to safety of plaintiff and his coworkers and not public at large).

Furthermore, Roy's complaints about Officer ███████ and her complaint that ███████ left the clinic without security for fifteen minutes, were targeted to the performance of two officers and did not describe systemic security failures.  The Fourth Circuit held that a police officer's speech about another officer's failure to monitor the transmission fluid in a police vehicle, thereby causing damage to the vehicle and hindering the officer's ability to respond to calls, did not involve a matter of public concern because "the relative unreliability of a single police vehicle simply is not of sufficient significance to attract the public's interest."  *Kirby,* 388 F.3d at 447.  By analogy, the failure of a single corrections officer to be in sight of the clinic staff at all times, or to be delayed a few minutes on one occasion in responding to a call, is not of sufficient significance to be a matter of public concern, particularly where there were numerous safety measures in place and there is no evidence of actual harm to Roy or anyone else.

The form of Roy's speech also indicates that her speech did not address a matter of public concern.  Internal complaints made directly up the chain of command do not typically indicate matters of public concern.  *See Kubiak*, 810 F.3d at 483.  The context of the reports is also inconsistent with matters of public concern, as the reports relate to Roy's personal disputes with individual officers, and she was motivated primarily by personal concerns in reporting the incidents.  *See id.* at 483-84.

Because Roy did not speak as a private citizen on matters of public concern, her speech

does not merit First Amendment protection and the analysis stops there.

> 3. Roy's interests in speaking do not outweigh DOC's interest in functioning efficiently.

The *Pickering* balancing test is the second step of the analysis.  *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Speech has to be made by a private citizen about a matter of public concern in order for courts to even reach the *Pickering* test.  *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003).  If it passes that hurdle, then the degree to which the speech's content has public value is relevant in the application of the *Pickering* test.  *See id.*

> Under *Pickering,* we are required to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.

*Id.* (quotation omitted).  The First Circuit has recognized the government's special and substantial interest in maintaining a stable, disciplined work environment and being able to trust employees in the context of law enforcement and correctional facilities:

> The importance of discipline, maintenance of harmony among co-workers, and close working relationships requiring personal loyalty and confidence is greater in the context of a law enforcement agency … than it might be in another type of government agency. Therefore, courts must be sensitive to the needs of law enforcement agencies in disciplining an employee whose expressive conduct interferes with these interests.

*Id.* at 53–54 (internal citations omitted); *see also Davignon*, 524 F.3d 91, 104 (1st Cir. 2008) ("Putting aside practical distinctions between correctional facilities and police departments, the importance of safety within correctional facilities cannot casually be dismissed."); *Curran v. Cousins*, 509 F.3d 36, 50 (1st Cir. 2007).

In balancing these interests, the Court should consider only the speech that motivated the decision to revoke Roy's security clearance.  *See Waters*, 511 U.S. at 681.  Therefore, the analysis should be limited to Roy's report that nursing staff were left unattended by security staff for fifteen minutes, and her refusal to write a report about her allegation, because those are the

actions that Bouffard relied on in making his decision to revoke Roy's security clearance. "[A]n employer has a greater interest in curtailing erroneous statements than correct ones, and still a greater interest in curtailing deliberate falsehoods. The government also has a more legitimate concern for speech which actually impairs its functions than for that which does not." *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir. 1985). If an employee's speech contains knowingly or recklessly false statements, the balance tilts strongly in favor of the employer. *See id.* at 840-41. However, even if the Court considered all the speech that the evidence shows either Bouffard or Ross knew about, it would not change the outcome of the *Pickering* test.

DOC had a legitimate interest in addressing Roy's false report about being left without security in the clinic for fifteen minutes. The record shows that the false report did cause actual disruption where MSP staff and CCS staff had a heated discussion about it, and Melquist even told Roy that he did not want to see medical staff and security staff fighting with each other and they needed to work together. However, Bouffard and Ross do not have to show that Roy's speech caused actual disruption in the workplace in order to justify their actions. *See Curran*, 509 F.3d at 49. Significant deference is given to government employers' predictions of disruption that may be caused by employee speech. *See id.* (citing *Waters*, 511 U.S. at 673). If a "substantial risk of disruption to the department is apparent from the text of the speech," then the employer's concerns about disruption are reasonable and should be given significant weight, especially in the context of a correctional facility. *Id.* at 49-50. As in *Curran*, there is no question that the risk of disruption stemmed directly from Roy's speech—a false report that security officers had failed to do their job, leaving CCS staff unprotected. As articulated by Melquist, medical staff and security staff have to work together, and false allegations do not foster a harmonious work environment.

More important than any actual disruption were Bouffard and Ross's consequent lack of trust and confidence in Roy.  Bouffard and Ross could not tolerate allowing Roy continued access to the MSP where she made a false report about a correctional officer and refused a direct order to put her report in writing for purposes of an investigation.[6]  The risk to a correctional facility of having an employee who makes false reports about coworkers and refuses to comply with DOC incident reporting procedures is too great where reliance on accurate reporting is critical and coworkers have to be able to trust each other in order to maintain a safe and secure environment.  *See id.* at 50.  For these reasons, Bouffard and Ross had a legitimate interest in quelling Roy's speech that outweighed her interest in making the speech and the public's interest in hearing it.

> 4.   Roy cannot show that she engaged in protected speech that was a substantial or motivating factor in the actions taken by Bouffard and Ross.

The State Defendants assert that none of the speech Roy made was protected by the First Amendment.  In particular, her false report about being left unattended by security in the clinic for fifteen minutes was not protected speech for the reasons discussed above.  It is this speech that matters because it was this speech, along with her refusal to write a report, that led Bouffard to revoke her security clearance.  *See Waters*, 511 U.S. at 681.  If the Court determined that any of the other speech that Roy engaged in could have been protected by the First Amendment, it would not save her claim because any other speech she may have made was not a substantial or motivating factor in the actions taken by Bouffard and Ross.  The record is clear in both Bouffard's written notification to CCS and his deposition testimony that he revoked Roy's security clearance because of the false report Roy made and because she refused to put her report in writing.  There is insufficient evidence to allow a reasonable factfinder to find that any other

---

[6] In doing both of these things, Roy engaged in unacceptable conduct per her own employer's handbook, reinforcing that Bouffard and Ross's expectations of Roy were justified.

speech made by Roy, protected or not, was a substantial or motivating factor in the actions taken by Bouffard and Ross.

    D.  <u>Bouffard and Ross are entitled to qualified immunity from Roy's claims for First Amendment retaliation.</u>

For the reasons discussed above, Roy cannot establish that either Bouffard or Ross violated her First Amendment rights. Whether or not a constitutional violation occurred, however, Bouffard and Ross are entitled to qualified immunity because no clearly established law put them on notice of an existing constitutional right such that either individual should have known that his actions violated that right. "Immunity exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." *Diaz-Bigio*, 652 F.3d at 50 (quoting *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69 (1st Cir. 2002)). Roy must "spotlight 'controlling authority' or 'a robust consensus of cases of persuasive authority' (if there is one) that forbade [each defendant] from acting as he did." *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 23 (1st Cir. 2016). "[T]he relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law." *Id.*

The difficulty for a reasonable official in Bouffard or Ross's position to determine whether Roy spoke in the course of her duties or as a private citizen, whether she spoke about a matter of public concern, and whether her interest in speaking outweighed DOC's interest in maintaining a safe and secure environment in the MSP, precludes a finding that Bouffard and Ross must have known that their actions were unconstitutional. In most First Amendment retaliation cases involving speech by a public employee, individual officials are granted qualified immunity because they could have reasonably believed that there was no First Amendment

31

protection under the specific circumstances they found themselves in.  *See Diaz-Bigio*, 652 F.3d at 52-53 (citing cases).  "[O]nly in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection." *Id.* at 53 (quoting *Jordan*, 428 F.3d at 75).

The First Circuit's decision in *Diaz-Bigio* is instructive.  In that case, the plaintiff, a municipal employee, made statements in the press accusing her employer's director of having economic interests in companies to which the employer had awarded contracts.  *Id.* at 46.  The city investigated the allegations and summonsed the plaintiff to provide testimony in support of her allegations, which she refused to do.  *Id.*  After the investigation concluded that her charges were false and groundless, the city terminated her employment.  *Id.*  The letter of termination informed the plaintiff that she was being terminated because she had made false and groundless allegations and because she failed to comply with the summons to appear before the investigatory body.  *Id.*

The First Circuit noted that the plaintiff's false and groundless allegations could be viewed in conjunction with her refusal to comply with the summons as "part of a broader disciplinary problem" that the city would be justified in addressing in order to maintain discipline.  *Id.* at 54.  The same is true here where the investigation into Roy's report convinced Bouffard and Ross that she had falsely stated that the clinic staff were left without security coverage for fifteen minutes, and that when directed to write a report, she refused.[7]  The *Diaz-Bigio* court noted that the plaintiff "violated a direct order from her supervisor" when she failed to comply with the summons, and that the defendants "could have also reasonably concluded that they did not have the necessary confidence and trust in [plaintiff] to maintain her employment

---

[7] In addition, Bouffard and Ross were told that Roy said she said Ross had told her she could not write reports.  Ross and Bouffard knew that could not be true.

going forward." *Id.* Similarly, Roy refused to write a written report as instructed by the MSP Captain. This, combined with the video proof that her allegation was false, led Bouffard and Ross to reasonably conclude that they did not have the necessary confidence and trust in Roy to allow her continued access to the facility. The *Diaz-Bigio* court noted that the fact that the city only terminated the plaintiff's employment <u>after</u> learning that her accusations were false supported the grant of qualified immunity. *Id.* Bouffard also waited until after he heard all of the information gathered by Ross, including what the video showed, before deciding to revoke Roy's security clearance. Finally, the *Diaz-Bigio* court emphasized that when an employee's speech is determined to have been false or erroneous, this fact strongly supports the employer's disciplinary decision. *Id.* at 54-55.

Bouffard and Ross acted in an objectively reasonable fashion given what they knew at the time. As in *Diaz-Bigio*, after learning that Roy had made a false allegation about security staff and had refused to write a report, they reasonably concluded that they could not maintain the necessary confidence and trust in her to allow her to continue having access to the MSP. "Even if this reasoning were mistaken, it would not have been egregiously so and, accordingly, qualified immunity is available." *Philip*, 537 F.3d at 34–35 (quoting *Wagner v. City of Holyoke,* 404 F.3d 504, 509 (1st Cir. 2005)).

Cases outside this Circuit also support the grant of qualified immunity in this case. In *Duffie v. Wichita County*, 990 F. Supp. 2d 695 (N.D. Tex. 2013), the court granted qualified immunity to sheriff's employees who allegedly revoked four nurses' security clearances and conspired to instigate a malicious prosecution against them after they reported another nurse to the licensing board and copied inmate medical records. *See Duffie*, 990 F. Supp. 2d at 713-14. The court noted that in First Amendment retaliation cases brought by public employees, there is

rarely sufficient precedent to put public officials on notice that termination or discipline of public employees would violate their constitutional rights. *See id.* at 714. The court concluded that the "contours of Plaintiffs' rights to report on unlawful conduct by other nurses at the county jail without adverse employment consequences, and the unlawfulness of disciplining or terminating nurses for copying patient records and reporting to outside agencies, were not so clearly outlined as to be apparent…." *Id.* Likewise, the unlawfulness of revoking Roy's security clearance for making a false report about prison security and refusing a directive to make a written report was not so clear as to be "beyond debate" and apparent to Bouffard and Ross.

In another example, *Vollette v. Watson*, 937 F. Supp. 2d 706 (E.D. Va. 2013), former contractors who worked at a city jail (including some CCS employees) sued the sheriff and his deputies for being subjected to allegedly unconstitutional strip searches. *Vollette*, 937 F. Supp. 2d at 711. Immediately after they filed suit, their security clearances were revoked, and consequently they amended their suit to add claims for First Amendment retaliation. *See id.* at 711-12. Defining the "threshold question" for qualified immunity on the First Amendment claim as "whether a reasonable Sheriff would have known that each of the federal complaints… touched on a matter of public concern," the court noted that, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected." *Id.* at 723 (quotation omitted). After commenting on how difficult it is for a public official to know whether speech is a matter of public concern, and whether the employer's interests outweigh the employee's interests, the court in *Vollette* acknowledged that there are some cases where it is both "<u>abundantly clear</u> that the employee is speaking on a matter of public concern and the employer can show <u>no demonstrable interest</u> in silencing the employee…." *Id.* at 723 (quotation omitted) (emphasis added). In most cases, however, "when the facts are close

34

enough to the ill-defined line between private speech and speech involving matters of public concern, the public employer is shielded by qualified immunity, even if the Court ultimately concludes that the speech at issue involves matters of public concern," *Id.* at 723-24 (internal quotation omitted).  The court in *Vollette* determined that the plaintiffs' lawsuits addressed a matter of public concern but found that it was a "close question" because the plaintiffs' lawsuits "had elements suggesting that each Plaintiff was merely seeking personal relief based on a personal grievance, as contrasted with a true 'whistleblower' type complaint filed against a public figure." *Id.* at 724.  Therefore, the court held that even if it assumed that the sheriff's revocation of the contractors' security clearances violated their First Amendment rights, it could not be said that it violated a clearly established constitutional right.  *See id.* at 724-25.

It is notable that in *Diaz-Bigio*, *Duffie*, and *Vollette*, the plaintiffs spoke publicly about issues that were more likely to be construed as matters of public concern than Roy's speech – speaking to the media about an executive's conflict of interest in awarding contracts, to a licensing board about a nurse's dangerously poor quality of care, and filing a lawsuit alleging an unconstitutional practice of strip searches, respectively.  Yet, in all of these cases, the legal questions were considered close enough to grant the individual government officials qualified immunity.  Roy did not speak to anyone except her CCS supervisors (she did not even speak directly to Ross or Bouffard), and the subject matter of her complaints was limited to isolated incidents that affected her directly.  Qualified immunity should be granted to Bouffard and Ross because the challenge that faced them was even tougher than the challenges faced by other defendants who have been granted immunity.  Under the circumstances they faced, they "could reasonably have believed 'on the facts' that no violation existed." *Diaz-Bigio*, 652 F.3d at 50 (quoting *Dirrane*, 315 F.3d at 69).

### *Conclusion*

For the foregoing reasons, the State Defendants respectfully request that the Court enter summary judgment in their favor on all of Plaintiff's claims alleged against them in the Complaint.

DATED:  August 9, 2017                    Respectfully submitted,

                                          JANET T. MILLS

                                          Attorney General

                                          /s/ Valerie A. Wright
                                          VALERIE A. WRIGHT
                                          Assistant Attorney General
                                          Office of the Attorney General
                                          6 State House Station
                                          Augusta, Maine  04333-0006
                                          Tel.  (207) 626-8800
                                          Fax (207) 287-3145
                                          Valerie.A.Wright@maine.gov

                                          Attorney for Defendants State of Maine,
                                          Department of Corrections, Rodney Bouffard, and
                                          Troy Ross

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 9, 2017, I electronically filed this State Defendants'

Motion for Summary Judgment with Incorporated Memorandum of Law with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing(s) to the following:

JOHN P. GAUSE, ESQ.
jgause@easternmainelaw.com

MELINDA J. CATERINE, ESQ.
mcaterine@littler.com

To my knowledge, there are no non-registered parties or attorneys participating in this

case.

/s/ Valerie A. Wright
VALERIE A. WRIGHT
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
Valerie.A.Wright@maine.gov