## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **TARA J. ROY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **1:16-cv-00383-JDL** |
| | ) | |
| **CORRECT CARE SOLUTIONS,** | ) | |
| **LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## *ORDER ON DEFENDANTS' MOTIONS
## FOR SUMMARY JUDGMENT

Tara J. Roy has filed suit against her former employer, Correct Care Solutions, LLC ("CCS"), and the Maine Department of Corrections ("MDOC"), with whom CCS contracted to provide healthcare services to inmates at the Maine State Prison in Warren, Maine. She also sues Rodney Bouffard, the prison's Warden, and Troy Ross, the Deputy Warden, in their individual capacities (collectively, the "Defendants"). She alleges that she was subject to sexual harassment and a hostile work environment, as well as unlawful retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e, *et seq.* (2018), and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551, *et seq.* (2017). Roy also asserts constitutional claims against Defendants Bouffard and Ross. All of the Defendants have moved for summary judgment on the claims against them (ECF Nos. 57 and 63). For the reasons that follow, I grant the Defendants' motions.

---

* This opinion is **SEALED** until 5:00 p.m. on Friday, April 6, 2018, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion(s) need to be redacted because of confidentiality restrictions.

## I.  FACTUAL BACKGROUND

Except where otherwise noted, the following facts are undisputed.

On August 13, 2012, Roy began working as a Licensed Practical Nurse employed by CCS at the prison; CCS had a contract with the MDOC, under which it provided healthcare services to inmates.  Roy's job description included a requirement that she maintain a security clearance.  Roy worked in the prison medical clinic, a part of the medical facility along with the infirmary, and was directly supervised by two CCS employees.  Two Corrections Officers employed by the MDOC are assigned to the medical facility to provide safety and security.

On February 5, 2013, Roy reported to her supervisors that MDOC Corrections Officer Snow had made inappropriate comments to her, including disparaging comments about her being blonde and female, and had made inappropriate and unwanted physical contact with her.   Roy considered Snow's conduct sexual harassment.   The MDOC investigated Roy's complaint and found insufficient evidence to support Roy's allegations, but Snow was reassigned out of the medical clinic and thereafter did not work directly with Roy.  Roy does not claim that Snow made any further inappropriate comments or physical contact after he was reassigned out of the clinic.

In April or May 2014, Roy became the sick call nurse in the medical clinic. Around that time, Officer Turner, one of the Corrections Officers often assigned to the medical clinic, made comments about women to Roy such as "why do we have females when . . . men do everything," and that a woman's "job is to be at home."  ECF No. 40 at 37.  Roy told Turner that these comments were offensive, but Turner

continued to make them.  Turner also, at times, ignored her, including her requests to bring sick inmates to the clinic.  On June 20, 2014, Roy filed an incident report that Turner had acted unprofessionally.  ECF No. 35-16.  Starting in June or July 2014, Roy made frequent oral complaints to her supervisors that Turner was absent from his post.  Roy sent additional emails to her supervisor on July 24 and July 31, 2014, complaining that Turner had left the clinic unattended.  Roy further complained to her supervisors that Turner, in response to her complaints against him, had retaliated by working slowly and being uncooperative.

Also starting in June or July 2014, Roy complained to her supervisors that Corrections Officers had asked her to share confidential inmate medical information.  Roy made similar complaints on August 1 and August 4, 2014.  On July 16, 2014, Roy emailed her supervisor to report that various officers were no longer speaking to her or would yell at her because she wouldn't disclose inmate medical information.  On July 17, 2014, Roy sent another email reporting similar behavior.

On August 4, 2014, Roy emailed her supervisor to report that Corrections Officer Parrow had told her to "stop being a bitch" in response to her informing him of what she believed to be correct workplace protocol.  Roy filed an incident report on August 26, 2014, reporting that Parrow called her a "bitch" a second time.  Roy and Parrow had been romantically involved but that relationship had ended.  On at least one occasion, Parrow, in explicit terms, propositioned Roy to become sexually involved again, but Roy rejected the advance.  Roy reported to her supervisor that Parrow was angry with her because she spurned his advance, and that she believed that Parrow had called her a "bitch" for the same reason.

Between July and September 2014, several Corrections Officers filed at least five reports complaining of unprofessional conduct by Roy, including one by Snow on September 18, 2014, that alleged that Roy had yelled at him.  Roy alleges—though the Defendants dispute—that these reports were either false or exaggerated, and were filed in retaliation against her earlier complaints about sexual harassment, safety concerns, and officers seeking confidential medical information.  Roy does not identify which of the alleged retaliatory reports were sexual harassment, and which were not.

On September 12, 2014, Roy filed an incident report complaining that a Corrections Officer had commented to another officer that they needed "to get [Roy] off her ass and moving," which Roy believed to be sexual harassment.  ECF No. 49-28.  On September 23, 2014, Roy filed an incident report arising out of a Facebook conversation with a different Corrections Officer.  In that conversation, the Corrections Officer stated that another officer was trying to get her fired for filing complaints against Turner and was spreading rumors that she had slept with "everyone in the prison."  ECF No. 35-20 at 2.  During the Facebook conversation, the officer asked to call Roy and she declined.  Several days later, still on Facebook, the officer messaged Roy that she should try to smile, and later wrote:  "I UN FRIEND YOU Tired of attitude. . . ."  *Id.* at 4.  Roy believed this behavior was sexual harassment and retaliation for her not speaking with him on the phone.

On September 26, 2014, Roy was working in the medical facility along with at least one other nurse.  There were two Corrections Officers on duty:  Officer King in the clinic and Officer Snodgrass in the infirmary.  At approximately 10:00 a.m., King

responded to an incident alert and left the clinic.  After King left, Roy and another nurse called Snodgrass three times to come to the clinic where there were three inmates present, but Snodgrass appeared to be sleeping and was barely responsive to their calls.  Surveillance footage shows that a different officer arrived at the clinic thirty seconds after King left in response to the alert and that Snodgrass eventually came to the clinic approximately six minutes after the alert.  At least one of those officers is seen on camera for all but, at most, one minute and 49 seconds of the fifteen minutes following King's departure (though Defendants contend there was a Corrections Officer present for all but the first 30 seconds after King left).  Roy reported to the prison Captain that she had been left unsupervised in the clinic without a Corrections Officer present.  Roy told the Captain that the Corrections Officer on duty in the clinic responded to an incident call, leaving prisoners unattended, and that the officer on duty in the infirmary did not arrive to cover the clinic for fifteen minutes.  The Captain told Roy that she needed to file an incident report, but she refused, stating that her supervisor had told her that Deputy Warden Ross did not want her to write any more reports.  The Defendants dispute that Ross told Roy to stop filing complaints and assert that Ross only wanted Roy's complaints to be better substantiated.  ECF No. 43 at 26.  Ultimately, the other nurse present at the time of the incident filed an incident report, indicating that there was no officer present in the clinic for roughly fifteen minutes.

Later on September 26, 2014, Roy's supervisors met with Ross, the prison Captain, and an MDOC human resources representative, among others, to discuss incident reports filed by Roy that had resulted in investigations.  At this meeting,

Ross expressed frustration that Roy was involved in so many investigations and stated that he wanted to revoke Roy's security clearance (stating that he wanted to "gate-close" her). CCS subsequently decided that Roy should be suspended to allow the situation to cool and to protect Roy from further allegations and complaints. On October 2, 2014, Bouffard emailed CCS that Roy's security clearance was being revoked because she misrepresented the truth and failed to follow the prison Captain's directive to file an incident report. Bouffard's decision was based on information reported to him by Ross. This decision was based, according to Bouffard, on the conclusion that Roy had alleged that the clinic was unsupervised for a period of fifteen minutes when, in fact, it had been at most less than two minutes, as well as her refusal to write an incident report.

On October 2, 2014, Roy's supervisor recommended that Roy be terminated by CCS because the MDOC had revoked her security clearance, which was a requirement for the job. CCS terminated Roy's employment that day. On or about May 26, 2015, Roy submitted a complaint to the Maine Human Rights Commission.

## II. SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A genuine issue is one that can be resolved in favor of either party and a material fact is one which has the potential of affecting the outcome of the case." *Gerald v. Univ. of P.R.*, 707 F.3d 7, 16 (1st Cir. 2013) (internal quotation marks omitted). The court, in determining

whether the movant has met its burden, views the record in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007).  If a party fails to address another party's assertion of fact, the court may "grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3); *see also Jaroma v. Massey*, 873 F.2d 17, 19-20 (1st Cir. 1989).

## III.    LEGAL ANALYSIS

I address, in turn, (A) the MDOC's argument that it is entitled to summary judgment on all claims against it because non-employers cannot be held liable under the MHRA and it was not Roy's employer; (B) Roy's claims for sexual harassment and hostile work environment against CCS; (C) Roy's claims for unlawful retaliation against CCS; and (D) Roy's constitutional claims against Bouffard and Ross.

### A.    MDOC Liability

Roy's Complaint alleges one count against the MDOC (Count III) under § 4633 of the MHRA for coercing CCS to terminate her employment, interfering with her rights, preventing CCS from complying with the MHRA, and retaliating against her. The MDOC argues, relying on the Maine Law Court's holding in *Fuhrmann v. Staples Office Superstore East, Inc.*, 58 A.3d 1083 (Me. 2012), and its progeny, that claims for employment discrimination pursuant to the MHRA can only be brought against an "employer."  *Id*. at 1097-98.  Because it is undisputed that Roy was employed by CCS and not by the MDOC, and there are no allegations that CCS and the MDOC are joint employers, the MDOC argues that judgment should be entered in its favor.  Roy

argues that *Fuhrmann* applies only to employment claims brought under § 4572 of the MHRA,[1] and not to claims for retaliation under § 4633 of the MHRA.[2]

In *Fuhrmann*, the plaintiff sued her former employer and four supervisors alleging whistleblower discrimination pursuant to § 4572 ("Unlawful Employment Discrimination"), which explicitly prohibits employment discrimination by "any employer." 5 M.R.S.A. § 4572(1)(A); 58 A.3d at 1086-87. The Law Court concluded that in light of the underlying purposes of the MHRA and the Maine Whistleblower Protection Act ("MWPA") (for which the MHRA provides a private right of action), and in the context of the statutory scheme as a whole, the definitions of "employer" under both the MHRA and the MWPA, "are meant to hold the principal/employer liable for acts of its agents/employees." *Fuhrmann*, 58 A.3d at 1097. Consequently, the Law Court ruled that individual supervisors cannot be held liable for employment discrimination under the MHRA, as that would undermine the legislative intent to "hold the ultimate employer accountable for rectifying discrimination. . . ." *Id.*

Roy argues that *Fuhrmann* is inapplicable because it only concerned § 4572, and her claims are brought under § 4633 ("Prohibition against Retaliation and Coercion"), which does not prohibit employment discrimination or contain the term "employer," but instead prohibits conduct by a "person." 5 M.R.S.A. § 4633(1), (2). This reasoning, however, contradicts *Fuhrmann's* central rationale—that the MHRA

---

[1]  5 M.R.S.A. § 4572 provides, in part: "It is unlawful employment discrimination . . . for any employer . . . to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment . . . ." 5 M.R.S.A. § 4572(1), (1)(A) (2017).

[2]  5 M.R.S.A § 4633 provides, in part: "A person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act . . . . It is unlawful for a person to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by this Act . . . ." 5 M.R.S.A § 4633(1), (2) (2017).

intends to hold *employers* liable for employment discrimination—by framing what is essentially an unlawful employment discrimination claim as a § 4633 retaliation claim. This argument has previously been rejected in three published decisions. *See Enos v. Orthopedic & Spine Physical Therapy of L/A, Inc.*, No. cv-13-176, 2014 Me. Super. LEXIS 225 (Me. Super. Nov. 18, 2014) (applying holding in *Fuhrmann* to dismiss whistleblower retaliation claim against individual supervisor brought under § 4633); *Charette v. St. John Valley Soil & Water Cons. Dist.*, 1:17-cv-35-GZS, 2017 WL 2683951 (D. Me. June 20, 2017) (same); *U.S. ex rel. Worthy v. E. Me. Healthcare Sys.*, 2:14-cv-00184-JAW, 2017 WL 211609 (D. Me. Jan. 18, 2017) (applying holding in *Fuhrmann* to dismiss retaliation claim against non-employer, third-party entity brought under § 4633).

In *Worthy*, the plaintiff, a former employee of a hospital, brought a § 4633 retaliation claim against a company that had contracted with the hospital to provide billing services. *Worthy*, 2017 WL 211609 at *3, 32. Like Roy, the plaintiff argued that § 4633 of the MHRA does not limit its scope to employers and instead prohibits any "person" from interfering with protected rights. *Id.* at *32. The Court applied *Fuhrmann* and dismissed the claims against the non-employer company that had contracted with the hospital, explaining:

> [T]he Maine Law Court concluded [in *Fuhrmann*] that only an employer can be liable for employment discrimination under the MHRA. Although the *Fuhrmann* case dealt with individual supervisor liability, the basic premise applies with equal force to this case. Only an employer can be liable under the MHRA for retaliation for whistle-blowing activity. To hold otherwise would mean that even though an individual supervisor cannot be held liable, a non-employer third party could be.

*Id.* (internal citations omitted).

*Worthy's* application of § 4633 is in harmony with the legislative purpose which informed *Fuhrmann's* interpretation of the MHRA's prohibition of employment discrimination.  Allowing non-employer liability to hinge solely on the section of the MHRA a plaintiff chooses to sue under would defeat the MHRA's central purpose, which is to hold an employee's ultimate principal/employer responsible for the discriminatory acts of its agents/employees.  *See Fuhrmann*, 58 A.3d at 1097-98 (quoting *Lever v. Acadia Hosp. Corp.*, 845 A.2d 1178, 1183 (Me. 2004) ("In construing statutes, we look to the overall purpose of the law of which the section at issue forms a part and strive to interpret the language to avoid results that are inconsistent, unreasonable, or illogical in relation to the law's overall purpose.")).  Thus, Roy cannot maintain a MHRA claim against the MDOC, a non-employer entity.  Summary judgment is therefore appropriate as to all claims against the MDOC (Count III).[3]

## B.   Hostile Work Environment

Roy also alleges claims for hostile work environment on the basis of sexual harassment and gender discrimination against her employer, CCS, pursuant to Title

---

[3] Roy appears to concede that her claims against the MDOC are brought solely under § 4633.  ECF No. 70 at 12 ("The claims here are not brought under § 4572(1), however, they are brought under § 4633.").  However, to the extent Roy's claims against the MDOC are brought under § 4553(10)(D) for aiding and abetting unlawful discrimination, whose language is quoted in Count III, *Fuhrmann* still demands dismissal.  As noted by the Court in *Worthy*:

> [I]f the MWPA retaliation provisions were interpreted as [the plaintiff] urges, the exception to [the] Maine Supreme Judicial Court's holding in *Fuhrman* would become the rule since an aiding and abetting allegation would necessarily survive a motion to dismiss and might even survive a motion for summary judgment, causing non-employers to fall within the MWPA in a manner contrary to *Fuhrmann*.  The Court declines to create an exception to the *Fuhrman* rule based on the aiding and abetting provision of the MWPA.

2017 WL 211609, at *33 (dismissing aiding and abetting claim brought under § 4553(10)(D)).  Likewise, Roy cannot save her MHRA retaliation claim against the MDOC by framing them as claims for aiding and abetting.

VII (Count I) and the MHRA (Count II).[4]  I address, in order, CCS' argument that (1) Roy did not administratively exhaust her sexual harassment and gender discrimination claims, and (2) Roy has not created a dispute of material fact as to her hostile work environment claim.

### 1. Administrative Exhaustion

CCS argues that Roy did not adequately raise her hostile work environment claims on the basis of sexual harassment and gender discrimination in her formal complaint filed in May 2015. The administrative complaint is "both a prerequisite for entry into federal court and a scope-setting device for the civil action that follows" under Title VII and relevant regulations.  *Brown v. Mabus*, 2:14-cv-426-NT, 2016 WL 6068116, at *2 (D. Me. Oct. 14, 2016).  If Roy failed to exhaust this process, her sexual harassment and gender discrimination claims would be barred from this civil action. *See Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999).

A plaintiff is not bound by the exact claims raised in her administrative complaint:  "[T]he scope of a civil action is not determined by the specific language of the charge filed with the agency, but rather, may encompass acts of discrimination which [an] investigation could reasonably be expected to uncover."  *Davis v. Lucent Techs., Inc.*, 251 F.3d 227, 233 (1st Cir. 2001) (internal quotation marks omitted); *see also Jorge v. Rumsfeld*, 404 F.3d 556, 565 (1st Cir. 2005) ("[T]he scope of the suit is . . . constrained by [the administrative complaint's] allegations in the sense that the judicial complaint must bear some close relation to the allegations presented to the

---

[4]  Having already determined that there is no MHRA liability against the MDOC as a non-employer (*see supra* Section III.A), I do not consider the allegations against it further.  There are no Title VII claims against the MDOC.

agency."). In determining what claims an investigation could reasonably uncover, courts may "look beyond the four corners of the underlying administrative charge," *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 32 (1st Cir. 2009), to consider "whether the factual statements in the plaintiff's complaint should have alerted the agency of an alternative claim." *Caldwell v. Fed. Express Corp.*, 908 F. Supp. 29, 35 (D. Me. 1995).

Here, Roy's claims for sexual harassment and gender discrimination are closely related to the allegations in her administrative complaint, which adequately alerted the Defendants to those claims. The body of Roy's administrative complaint alleged facts intimating sexual harassment and gender discrimination, including her allegations of retaliation by male coworkers based on rejected romantic overtures (ECF No. 36-1 at ¶¶ 11, 15) and the allegation that she sought a transfer because she felt that she was being unfairly targeted due to being a "young, single woman working in a mostly male environment." ECF No. 36-1 at ¶ 16; *see also Spinney v. Spencer*, No. 2:15-cv-459-NT, 2017 WL 4293141, at *4 (D. Me. Sept. 27, 2017) (finding that EEO complaint that stated "[f]or years, I have been consistently discriminated against because of my gender" suggested on its face a hostile work environment claim despite omission of claim). The record further indicates that, in responding to Roy's administrative complaint, the MDOC itself characterized the complaint as alleging sexual harassment. ECF No. 73-2 at 3 ("[Roy] alleges that she was subjected to sexual harassment during her employment . . . ."). Thus, Roy adequately exhausted her administrative remedies as to her claims for sexual harassment and gender discrimination.

### 2. Allegations of Hostile Work Environment

The MHRA and Title VII provide that it is unlawful employment discrimination for an employer to discriminate against an employee on the basis of sex with respect to compensation, terms, conditions or privileges of employment. 5 M.R.S.A. § 4572(1)(A); 42 U.S.C. § 2000e–2(a)(1). Accordingly, a plaintiff may establish a violation of Title VII or the MHRA by demonstrating that an employer required the plaintiff to work in a hostile or abusive environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Watt v. UniFirst Corp.*, 969 A.2d 897, 902 (2009).

To succeed on a hostile work environment claim under Title VII or the MHRA, six elements must generally be established:

> (1) that [the plaintiff] is a member of a protected class; (2) that [she] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that [she] in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated.

*Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 27 (1st Cir. 2011); *Bodman v. Maine, Dep't of Health & Human Servs.*, 720 F. Supp. 2d 115, 119-20 (D. Me. 2010). "There is no mathematically precise test that [courts] employ to answer" whether conduct was severe or pervasive enough as to alter the conditions of employment. *Gerald*, 707 F.3d at 18. Instead, courts weigh numerous factors, including the frequency and severity of the discriminatory conduct; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

CCS first argues that Roy's allegations regarding Officer Snow are time-barred and must not be considered in evaluating Roy's hostile work environment claim. Claims of harassment or retaliation under Title VII and the MHRA must be filed with the Equal Employment Opportunity Commission ("EEOC") or the Maine Human Rights Commission ("MHRC") within 300 days after the alleged unlawful practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1); 5 M.R.S.A. § 4611. Here, Roy complained that Snow had engaged in sexually harassing conduct on February 5, 2013, but she did not file her Complaint until May 26, 2015, more than 300 days after the alleged misconduct occurred. However, "an equitable exception to the 300-day filing period is recognized under Title VII for the 'ongoing pattern[s] of discrimination' that are part and parcel with hostile work environment claims." *Franchina v. City of Providence*, 881 F.3d 32, 47 (1st Cir. 2018) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 726 (1st Cir. 2001) (citations omitted)). This exception, known as the "continuing violation doctrine," "allows plaintiffs to proceed on a hostile work environment claim 'so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period.*'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) (emphasis added)).

Roy has failed to show that the events which she claims generated a hostile work environment that occurred within the 300-day period were substantially related to Snow's earlier behavior. Snow figures only once in the subsequent acts which Roy

alleges:  that in response to her filing complaints regarding officer misconduct, Snow filed a September 18, 2014, report citing her for rude and unprofessional behavior (ECF No. 49-9) which, she alleges, was false or "overblown."  ECF No. 74-3 at ¶ 101. Snow's alleged retaliatory report is not substantially related to his alleged harassing behavior that occurred a year and a half earlier and, which Roy acknowledges, was not repeated.  Thus, there is no evidence of a pattern connecting Roy's 2013 allegations against Snow to subsequent events.  The 2013 allegations against Snow are therefore time-barred.

The remaining conduct Roy cites in support of her claims of a hostile work environment are not, considered together, so objectively severe or pervasive as to alter the terms and conditions of her employment.  Roy's claim encompasses the following conduct:  (1) Officer Turner made derogatory comments and jokes about women to her, including comments that disparaged a woman's role in the workplace and that were disrespectful to her; (2) several officers retaliated against her for refusing to disclose inmate medical information by calling her names, yelling at her, and purposefully slowing or impeding her ability to perform her work duties; (3) Officer Parrow made romantic advances after their romantic relationship had ended, called her a "bitch" on multiple occasions, impeded her work, and treated her angrily after she rejected his advances; (4) multiple officers filed false or overblown reports about her in retaliation for filing her complaints about Turner, Parrow, and officers seeking confidential patient medical information; (5) on one occasion, an officer commented to another officer that they needed to "get [Roy] off her ass and moving"; (6) an officer asked her for her phone number on Facebook and, in response to her

refusal to speak to him on the phone, sent unfriendly Facebook messages to her; and (7) an officer spread a rumor that she was sleeping with everyone in the prison and sought to get her employment terminated because of her complaints against other officers.

Much of the conduct Roy alleges was not based on her sex. To survive summary judgment, Roy must articulate a genuine issue of material fact as to whether the offensive conduct would not have occurred *but for* her sex. *See Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1053-54 (Me. 1992) (constant use of vulgar language in the workplace and offensive and unprofessional conduct did not sustain claim of hostile environment due to sexual harassment where the record did not support that the vulgar language and conduct was directed at plaintiff because she was a woman). Roy's allegations that several officers retaliated against her for refusing to disclose inmate medical information, that several officers filed false or overblown reports about her in retaliation for her filing complaints about officers seeking confidential medical information, and that an officer commented that they needed to "get [Roy] off her ass and moving" are not connected to Roy's sex. *See Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 190-91 (1st Cir. 2003) (upholding summary judgment for employer where plaintiff was subject to "vulgar and unprofessional environment" based on "[a] constellation of factors" rather than her protected class). Additionally, Roy has acknowledged that she did not perceive Officer Parrow calling her a "bitch" to be conduct based on sex, but was instead based on his anger resulting from the breakup of their previous romantic relationship. ECF No. 40 at 42.

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Roy's remaining allegations of harassing conduct—that one officer made derogatory comments and jokes about women to her, that another asked her for her phone number and then sent harassing messages to her on Facebook when she refused, that a third officer spread sexual rumors about her, and that several officers filed false complaints against her for reporting sexual harassment (or possibly for other complaints Roy made)—considered together in the light most favorable to Roy, represent isolated incidents which, although no doubt disturbing and offensive, do not demonstrate a severe and pervasive hostile work environment. The alleged conduct, occurring intermittently over a period of six months, did not reach the level of frequency that courts in this Circuit have deemed sufficiently pervasive to constitute a hostile work environment based on sexual harassment. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam) (quoting *Faragher*, 524 U.S. at 788) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (finding hostile work environment where harassment was "more or less constant" from plaintiff's first day until her last); *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 260-61 (1st Cir. 2000) (finding hostile work environment where "disgusting comments" and conversations occurred "everyday"); *Paquin v. MBNA Mktg. Sys., Inc.*, 233 F. Supp. 2d 58, 64 (D.

Me. 2002) (finding five instances of inappropriate conduct were not sufficiently frequent to establish an abusive working environment).

Furthermore, the alleged harassing conduct was not severe, as that concept has been developed in the Title VII context. *See Faragher*, 524 U.S. at 788 (quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992)) (Title VII does not protect "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing"); *see also Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 783 (1st Cir.1990) ("[A]n isolated sexual advance, without more, does not satisfy the requirement that an employee asserting a cause of action for hostile environment discrimination demonstrate an abusive workplace environment."), *abrograted on other grounds by Smith v. F.W. Morse & Co.*, 76 F.3d 413 (1st Cir. 1996); *Santiago v. Lloyd*, 66 F. Supp. 2d 282, 287 (D.P.R. 1999) ("No reasonable person could objectively believe that" a male employee calling a female employee a "bitch" on one occasion and claiming she was in a sexual relationship with a coworker was sufficiently severe to constitute reasonable belief of sexual harassment).

Because Roy has not articulated a genuine issue of fact as to whether the alleged conduct was sufficiently severe and pervasive as to alter the conditions of her employment and create an abusive environment, CCS is entitled to summary judgment on Roy's claim for hostile work environment on the basis of sexual harassment.[5]

---

[5] Because this ground is dispositive of Roy's Title VII and MHRA claims, I do not address the remaining factors needed to analyze a workplace harassment claim.

C.    **Unlawful Retaliation**

To establish a *prima facie* case of retaliation under Title VII, 42 U.S.C. § 2000e-3, or the MHRA, 5 M.R.S.A § 4633, Roy must demonstrate that:  (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected activity.  *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107 (1st Cir. 2015).  Establishing a *prima facie* case of retaliation is a "relatively light burden."  *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008).  If the employee establishes a *prima facie* case, the claim is then analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 221-23 (1st Cir. 2007); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the burden shifts to the employer to produce a legitimate, non-retaliatory justification for the adverse employment action.  *See Mariani-Colón*, 511 F.3d at 221-22.  If the employer does so, the burden shifts back to the employee, who must show that the proffered justification is in fact pretextual.  *See id.*

Roy's claim for unlawful retaliation against CCS fails at the first analytical step because there is no genuine issue of material fact as to whether she engaged in "protected activity" when she reported to CCS what she believed were illegal practices committed by MDOC officers.  For a report to be protected by the MWPA and MHRA, it is "require[d] that the report must address violations, conditions, or practices that the employer has the ability and authority to correct, and those violations, conditions, or practices complained of must bear a direct relationship to the employee's current employer."  *Hickson v. Vescom Corp.*, 87 A.3d 704, 711 (Me. 2014).

Roy's allegations indicate only that she was directly supervised by CCS employees, that she was expected to submit complaints related to employment issues to her CCS supervisors, and that she repeatedly complained to her CCS supervisors about the conduct of MDOC officers.  By Roy's own admission, however, her CCS supervisor lacked the authority to correct the conduct of MDOC employees.  Roy asserts that (1) incident reports completed by CCS employees relating to MDOC employees were given to the MDOC the same day they were completed, and then reviewed by the MDOC; (2) CCS generally reports complaints about MDOC officers to the MDOC; and (3) CCS does not conduct investigations into CCS staff complaints about MDOC staff, instead leaving such investigations to the MDOC.  These facts, which Roy concedes, demonstrate that her employer, CCS, was in no position to address the alleged violations of the MDOC Corrections Officers that Roy reported.

In support of her argument, Roy emphasizes that on at least one occasion CCS employees attended a meeting related to a MDOC investigation into one of Roy's incident reports.  Roy has not, however, put forth evidence showing that CCS had the ability or authority to change the outcome of the MDOC's investigations, including its decision to "gate-stop" her, nor has she controverted the evidence Defendants have put forth to the contrary:  "[CCS] does not employ or control the Corrections Officers who work at the Maine State Prison, it does not have any authority or ability to discipline or discharge the Corrections Officers, and it does not participate in any decisions regarding the discipline or discharge of Corrections Officers."  ECF No. 80-2 at ¶ 4.  Unlike *Hickson*, where the plaintiff's employer was in charge of safety and security at a mill and had the authority to correct the safety violation reported by the

plaintiff, 87 A.3d at 711, CCS had no authority to alter the conduct of the Corrections Officers that Roy complained about. Roy therefore cannot demonstrate that she engaged in protected conduct when she reported alleged misconduct by MDOC Corrections Officers to her CCS supervisors. Accordingly, CCS is entitled to summary judgment on Roy's retaliation claim.

## D.   Constitutional Claims against Bouffard and Ross

I address, in turn, Roy's Equal Protection and First Amendment claims against Bouffard and Ross.

### 1. Equal Protection

Roy's Equal Protection claims against Bouffard and Ross, brought under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C.A. § 1983 (2018), allege that Bouffard and Ross failed to stop prison staff from sexually harassing and retaliating against her for complaining about sexual harassment, and that they themselves retaliated against her for complaining about sexual harassment.

"When a plaintiff attempts to use § 1983 as a parallel remedy to a Title VII claim, the *prima facie* elements to establish liability are the same under both statutes. In either case, the plaintiff must prove that the defendants acted with discriminatory intent." *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003) (internal footnote, citations, and quotation marks omitted); *see also Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988) ("To prove a violation of the equal protection clause, a plaintiff must show that the defendant acted with discriminatory intent."). In addition, "the First Circuit has made clear that an Equal

Protection claim involves an additional element not present in garden-variety employment discrimination claims—'[s]ome evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim.'" *Charette*, 2017 WL 2683951 at *14 (*quoting Ayala-Sepúlveda v. Mun. of San Germán*, 671 F.3d 24, 32 (1st Cir. 2012)).

Roy cannot establish an Equal Protection claim against Ross or Bouffard because, as already discussed, she cannot establish the *prima facie* elements of a claim for sexual harassment under Title VII. *See supra* Section III.B. Even if Roy could make a *prima facie* case for sexual harassment, Roy has not offered any evidence indicating that either Bouffard or Ross treated Roy differently from others similarly situated. Thus, Defendants Bouffard and Ross are entitled to summary judgment on Roy's Equal Protection claims.[6]

Roy's contention that Ross and Bouffard failed to stop MDOC staff from sexually harassing Roy is similarly unavailing. The claims against Bouffard and Ross are claims for supervisory liability under § 1983 because they are not alleged to have engaged in harassment themselves, and supervisory liability "may not be predicated upon a theory of respondeat superior," *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989), and thus a supervisor can only be held liable for the actions of subordinates where there is an affirmative link between the supervisor and the subordinate's behavior that could be characterized as "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate

---

[6] To the extent Roy's Equal Protection claims are premised on Bouffard and Ross' alleged retaliation or failure to prevent retaliation, such claims are not properly brought under the Equal Protection Clause. *See Rodriguez-Melendez v. Rivera*, No. CIV. 97-1258 SEC, 1998 WL 151870, at *3 (D.P.R. Mar. 23, 1998) ("[V]arious circuits have clearly established that a pure or generic retaliation claim does not implicate the Equal Protection Clause.").

indifference." *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002) (quoting *Lipsett*, 864 F.2d at 902).   The link "must be a strong one, as that requirement contemplates proof that the supervisor's conduct led *inexorably* to the constitutional violation." *Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19-20 (1st Cir. 2014) (internal quotation omitted) (emphasis in original).   Here, Roy's Equal Protection claims do not clear the high bar necessary to show deliberate indifference.   This further supports the conclusion that Bouffard and Ross are entitled to summary judgment on the Equal Protection claims (Count IV).

### 2. First Amendment

Roy alleges that Bouffard and Ross violated her First Amendment rights by failing to stop the prison staff from retaliating against her for complaining about matters of public concern, and by retaliating against her themselves for the same.   To succeed on her First Amendment claim, Roy must show that (1) she was speaking as a private citizen on a matter of public concern; (2) her interests, as a citizen, in commenting upon matters of public concern outweighed her employer's interest in promoting the efficiency of the public services it performs through its employees; and (3) the protected expression was a substantial or motivating factor in an adverse employment decision.   *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011).

To determine whether Roy's speech was made as a private citizen or rather, as Bouffard and Ross contend, as an employee within the scope of her job, "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).   "[T]he mere fact that a citizen's speech concerns information

23

acquired by virtue of [her] public employment does not transform that speech into employee—rather than citizen—speech." *Id.*

Here, Roy complained about (i) neglect of duty by Corrections Officers charged with providing security in the medical clinic of a prison; (ii) Corrections Officers seeking confidential inmate medical information; as well as (iii) sexual harassment and retaliation by public Corrections Officers.  Because Roy was a nurse in the prison medical facility, issues concerning security and sexual harassment were not "ordinarily within the scope of [her] duties." *Lane*, 134 S. Ct. at 2379.  Thus, Roy has raised a dispute of fact as to whether she was speaking as a private citizen.

Whether Roy's speech addressed a matter of public concern is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  Bouffard and Ross argue that Roy's speech involves matters of personal interest, and the First Amendment does not empower plaintiffs to "constitutionalize the employee grievance." *Id.* at 154. However, "[w]hile it is true that the First Amendment does not empower [public employees] to constitutionalize the employee grievance, it is also true that certain speech is of an inherent public concern, such as official malfeasance or the neglect of duties." *Leahy-Lind v. Me. Dep't of Health & Human Servs.*, No. 1:13-cv-00389-GZS, 2014 WL 4681033, at *18 (D. Me. Sept. 19, 2014) (internal quotations omitted).

Roy's allegations, viewed in the light most favorable to her, do not implicate issues of public concern for purposes of supporting an alleged violation of the First Amendment.  As already discussed (*see supra* Section III.B), Roy's allegations of harassment relate exclusively to isolated incidents involving different officers, some

of which occurred outside of the workplace. Roy's speech concerning her own personal interest is not a matter of public concern. *See Rosado-Quiñones v. Toledo*, 528 F.3d 1, 5 (1st Cir. 2008) (allegations of personal animosity expressed by fellow employees did "not even approach matters of inherent public concern" in the law enforcement context).

Neither do Roy's complaints regarding various Corrections Officers' neglect of duty implicate public concern. As the First Circuit has recognized:

> [I]f either official misconduct or neglect of duties was asserted to be responsible for unsafe conditions for the *general public*, this would be a matter of public importance. If, however, the performance critiques concerned only matters of internal working conditions, and the discussion of "safety issues" . . . likewise reflected an employee workplace concern rather than the public interest, plaintiffs' constitutional claim would falter at the threshold inquiry.

*Jordan v. Carter*, 428 F.3d 67, 73 (1st Cir. 2005) (emphasis added). Roy's complaints regarding the security provided in the medical facility did not relate to the safety of the general public, but were limited to the safety of the staff and inmates in the prison medical facility. Roy's First Amendment claims therefore fail the first step of the required analysis.

However, even if Roy could make out a First Amendment claim, that claim would still be subject to dismissal because Bouffard and Ross are entitled to qualified immunity. A qualified immunity analysis consists of two parts: (1) whether Roy alleges facts that, if true, demonstrate violations of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violations. *See Stamps v. Town of Framingham*, 813 F.3d 27, 33-34 (1st Cir. 2016); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The second part, in turn, has two components:

(1) were the "legal contours of the right in question" sufficiently clear so a reasonable official would understand what was a violation, and (2) within the case's factual context, would a reasonable official understand at what point his or her conduct violated the right?  *Stamps*, 813 F.3d at 34.  So long as the defendant is "not contravening clearly established law, [the defendant is] entitled to qualified immunity." *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (per curiam).

Assuming *arguendo* that Roy has satisfied the first requirement and demonstrated a violation of a constitutional right, the record indicates that Bouffard and Ross would not reasonably have understood that their conduct violated Roy's First Amendment rights.  The undisputed facts show that on September 26, 2014, Roy reported to the prison Captain that she had been left unsupervised in the clinic without a Corrections Officer present.  Roy admits that she told the Captain that the Corrections Officer on duty in the clinic responded to an incident call, leaving prisoners unattended, and that the officer on duty in the infirmary did not arrive to cover the clinic until fifteen minutes later.  An incident report was filed indicating that there was no officer present in the clinic for roughly fifteen minutes.  Roy further admits that surveillance footage shows that the second officer arrived in the clinic six—not fifteen—minutes after the first officer responded to the alert, and that a different officer arrived thirty seconds after the alert and is seen on camera for all but one minute and 49 seconds of the fifteen minute period in question.  Thus, the surveillance footage constituted credible evidence that the clinic was either not unsupervised by the officers, or if it was unsupervised, the gap in supervision lasted no longer than one minute and 49 seconds.  Bouffard, based on information reported

to him by Ross, decided to revoke Roy's security clearance.  This decision was, in part, based on the conclusion that Roy had falsely reported that the clinic was unsupervised for a period of fifteen minutes.

Given the preceding information, it was not unreasonable for a deputy warden in Ross' position, or a warden in Bouffard's position, to believe that disciplining Roy for having made a false allegation concerning prison security would not infringe on her First Amendment rights.  Qualified immunity ultimately shields "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The record does not indicate that Bouffard and Ross fall into either of those categories.  Instead, the record reflects that their actions were taken in response to information which supported their conclusion that Roy had recklessly or knowingly made a false allegation regarding security, which is a matter of serious concern in any prison setting.

Because it was far from certain that Bouffard and Ross' conduct would infringe Roy's First Amendment rights to any appreciable degree, their actions fall within the protection afforded by qualified immunity.  Accordingly, Roy's First Amendment claims cannot survive summary judgment.

## IV.  CONCLUSION

For the reasons explained above, CCS' Motion for Summary Judgment (ECF No. 57) and the MDOC's, Bouffard's, and Ross' Motion for Summary Judgment (ECF No. 63) are **GRANTED**.

SO ORDERED.

Dated this 30th day of March, 2018

_____/s/ JON D. LEVY_____
**U.S. DISTRICT JUDGE**